**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

LINCOLN NATIONAL LIFE
INSURANCE COMPANY
                    Plaintiff,
      vs.

JACKSON NATIONAL LIFE
INSURANCE COMPANY AND
JACKSON NATIONAL LIFE
INSURANCE COMPANY OF NEW
YORK,
                    Defendants.

JACKSON NATIONAL LIFE
INSURANCE
COMPANY AND JACKSON
NATIONAL LIFE INSURANCE
COMPANY OF NEW YORK,
        Counterclaim Plaintiffs,

      vs.

LINCOLN NATIONAL LIFE
INSURANCE COMPANY,
        Counterclaim Defendant.

CASE NO.: 1:07-CV-265-JVB-RBC

**OPINION AND ORDER**

**A.    Introduction**

    Plaintiff Lincoln National Life Insurance Company ("Lincoln") alleges that Jackson National

Life Insurance Company and Jackson National Life Insurance Company of New York

(collectively, "Jackson") infringed upon three of its patents: U.S. Patent No. 6,611,815 ("the

'815 Patent"), U.S. Patent No. 7,089,201 ("the '201 patent"), and U.S. Patent No. 7,376,608

("the '608 patent"). The '201 and '608 patents are in the same family. They both, in somewhat

different languages, disclose a computerized method to administer variable annuity that has a guaranteed minimum payment feature regardless of market activities. The '815 patent teaches a data processing method that provides liquidity while guaranteeing lifetime payments.

In front of this Court, Lincoln and Jackson seek construction on claims 35–39, and 42 of the '201 patent; claims 1–3, 5, 7–10, 14, 15, and 17–19 of the '608 patent, and claims 1, 21, 28, and 32 of the '815 patent.

## B.    Background of the Inventions

All three patents in this case relate to methods of administering annuity products. Annuities are insurance contracts where a party pays an insurance company a principal in exchange for a series of payments over time. Annuitants select benefit options that determine the length of the benefit payments. Some contracts offer a lifetime income regardless of how long the annuitant lives. Others guarantee payments for a number of years. ('815 patent, col. 1, lns. 46 – 51.) In this way, annuities protect retired individuals and their spouse against the risk of outliving their accumulated assets. (*See* '815 patent, col. 1, lns. 29 – 33.)

### *(1)    Classifications of Annuities*

There are two kinds of classifications for annuities. One categorization is based on the timing of when the insurer starts making payments to annuitant. Immediate annuities and deferred annuities belong to this category. An immediate annuity is a policy where the insurer instantly begins to distribute a series of payments according to contractually agreed terms when annuitants pay the insurer a lump sum of principal. A deferred annuity is essentially two-phased. During the accumulation phase, customers deposit into or withdraw assets from their accounts. Later, the contract holders annuitize the account, which converts the accumulated value to a series of future

income payments by the insurer. ('815 patent, col.2, lns. 42–46.) Then, while the annuitants receive regular disbursement from the insurance company, they can no longer withdraw in excess of monthly payments. ('815 patent, col. 3, lns. 57– 60.) Although this traditional type of policy guarantees income, it poses liquidity problems. As a result, the contract holders may choose not to annuitize, and instead make systematic withdrawals from their annuity while maintaining the account in its accumulation phase. ('815 patent, col. 3, lns. 62 – 67.) The systematic withdrawal program, however, also has its risks. If the annuitant withdraws too much money early on, the account value will be depleted later in life. Alternatively, if the withdrawals are maintained as a percentage of account value, and such percentage level is set too high, most of the account value will be distributed out in the early years, leaving too small of an account base to achieve meaningful income later in life. ('815 patent, col. 4, lns. 1–21.)

Besides grouping annuities by the timing of the initial payment, annuities are also classified based on who bears the investment risk. In a fixed annuity, the insurer bears the investment risks. The insurer guarantees a rate of interest applicable to each annuity deposit. ('201 patent, col.2, lns. 3–5.) Hence, the account value during the accumulation phase can only increase with time. ('201 patent, col.2, lns. 21–22.) The amount of payment during the distribution phase is known to the annuitant when the account value is exchanged for an annuity benefit option. ('201 patent, col.2, lns. 36 – 39.) In a variable annuity, the policy holder bears the investment risks. ('201 patent, col. 2, lns. 10–13.) During the accumulation phase, the account value may or may not increase with time, depending on the investment markets. ('201 patent, col. 2, lns. 22–25.) In the distribution phase, the dollar amount to be paid is unknown when the asset deposit is exchanged for future payments. Instead, the accumulated account value is used to purchase annuity units.

The amount of annuity units usually doesn't change in the distribution phase, but the value of each annuity unit changes with investments. (*See* '201 patent, col. 2, lns. 50–65.)

*(2)*     ***Summary of Plaintiff's Inventions***

Patents '201 and '608 are in the same family. They both disclose a computerized method of providing a guarantee for the systematic withdrawal program, which only applies to the pre-annuitization phase. ('201 patent, col. 5, lns. 17–20; col.10, lns. 57–59.) During the accumulation phase, the contract holder chooses a liquidity period to receive this benefit option, which provides full accessibility of account value. The liquidity period chosen can be lifetime. (*See* '201 patent, col. 5, lns. 21–25.) If the contract holder's withdrawal rate does not exceed a pre-determined percentage, the insurer guarantees the ability of continuous withdrawal for the contractually agreed period, even if the account value reaches zero due to poor investment performance. (*See* '201 patent, col.11, lns. 19–34.) If the annuitant makes additional deposits or withdrawals in excess of the designated withdrawal amount, the current withdrawal amount will be adjusted accordingly. ('201 patent, col. 12, lns. 51–59.) At the end of this liquidity period, the remaining account value is annuitized, and thus liquidity is given up as in traditional annuitization. ('201 patent, col. 5, lns. 4–8.)

Patent '815 addresses liquidity problem after annuitization by allowing contract holders to access the account value even after annuitization. ('815 patent, col.4, lns. 35–37.) Besides receiving regular payments, account owners are free to withdraw from their accounts. When the account value is exhausted due to poor investment performance, for example, the insurance company will continue making guaranteed payments for the remaining life of the annuitant. ('815 patent, col. 4, lns. 29–33.) Owner initiated transactions such as withdrawals and deposits

will change the account value. In the meantime, the insurer establishes a variety of charges for providing lifetime guarantee. Account value is reduced by these charges and optional benefit payments. ('815 patent, col.12, lns. 58–61.) Future periodic payments will be adjusted accordingly based on changes to the account value. ('815 patent, col.13, lns. 41–43; Figure 3–4.)

### C.      Previous Constructions by Other District Courts

Of the three patents at issue, two of them ('201 patent and '815 patent) have previously been interpreted. In March 10, 2008, Judge Bennett in the Northern District of Iowa construed independent claim 35 and dependent claims 36, 37, and 38 of the '201 patent. *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 550 F. Supp. 2d 865 (N.D. Iowa 2008) ("the '201 *Markman* Order"). The parties then tried the case in front of a jury, which found that that Transamerica infringed upon claims 35, 36–39, and 42 of the '201 patent.[1] Unhappy with the verdict, Transamerica filed motion for judgment as a matter of law ("JMOL"), contending that the evidence was insufficient to support the jury's verdict. The Iowa court denied the motion. On appeal to the Federal Circuit, Transamerica did not challenge the court's claim constructions, but rather argued that it was entitled to JMOL that the asserted claims did not infringe on plaintiff's patent. *Lincoln Nat. Life Ins. v. Transamerica Life Ins.*, 609 F.3d 1364, 1367 (Fed. Cir. 2010). The Federal Circuit reversed Iowa court's decision in denying the motion for JMOL. *Id* at 1370. In reaching this decision, the Federal Circuit used Iowa court's claim construction.[2] Specifically,

---

[1] The parties agreed on the interpretation of claims 39 and 42 of the '201 patent in Iowa litigation. *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 550 F. Supp. 2d 865 (N.D. Iowa 2008).
[2] The Federal Circuit found that Transamerica's computerized system does not infringe because it stops making payments and its Distribution Services department provides a manual check to the policy owner when the account value is exhausted. Since the payment under Transamerica's GMWB rider relates to account value, Transamerica's insurance product does not match step (e) of claim 35 which guarantees payment regardless of account value. *Lincoln Nat. Life Ins. v. Transamerica Life Ins.*, 609 F.3d 1364, 1370 (Fed. Cir. 2010).

the Federal Circuit reiterated that step (e) of claim 35 does not require actual exhaustion of account value. Rather, it guarantees payment regardless of account value.

In a separate litigation between Lincoln National and Transamerica, Judge Springmann in this district interpreted independent claim 1, and dependent claims 21 and 28 of the '815 patent. *Lincoln Nat'l Life Ins. Co., v. Transamerica Financial Life Ins. Co.*, 2007 WL 710119 (N.D. Ind. filed March 6, 2007) ("the '815 *Markman* Order"). Among other things, Judge Springmann limits the term "account value" to the post-annuitization period. She defines the word "annuitization" to mean "the point when the annuitant starts to receive regularly scheduled payments from the annuity." *Id*. at *10–11. In addition, the '815 *Markman* Order interprets "withdrawal" to have a different meaning as "payment". *Id*. at *12. Soon after the claim construction order, parties settled the litigation.

### (1)     Issue Preclusion Does Not Apply

After reading the parties' briefs, this Court finds that several issues in dispute overlap with the ones already decided in previous Iowa and Indiana litigations. Thus, the Court will address the doctrine of issue preclusion before getting into claim interpretations.

Issue preclusion (also called collateral estoppel) requires a court to honor the prior court's adjudication on the same litigated issue. *Chi. Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997) (internal citation omitted). The Federal Circuit applies regional circuit laws on issue preclusion because the doctrine does not depend on any "rule of law having special application to patent cases". *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1230 (Fed. Cir. 2006).

The Court of Appeals for the Seventh Circuit has made it clear that issue preclusion applies when (1) the issue sought to be precluded is the same as that involved in a prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action. *H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 760 (7th Cir. 2007). The parties' disagreements in this case center on the application of the third and fourth factors of the test. Following the analysis below, the Court finds that neither the '201 *Markman* Order nor the '815 *Markman* Order carries the preclusive effect.

(a)     *The '201 Markman Order is Not Binding Because No Privity Exists Between Jackson and Transamerica*

The plaintiff seeks to preclude defendant from relitigating Iowa court's interpretation of the '201 patent. However, due process prevents asserting collateral estoppel against a party who was not in the prior litigation. *Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 (7th Cir. 1995); *see also Kim v. Earthgrain Co.*, 2005 WL 66071*9 (N.D. Ill. 2005) (refusing to apply collateral estoppel when the plaintiff asserted the doctrine against the defendant who was not a party in the previous litigation). Jackson was not a party to the litigation between Lincoln and Transamerica in Iowa. Nor does Lincoln offer any evidence proving privity exists between Jackson and Transamerica.

(b)     *The '815 Markman Order is Not Binding Because It is Not Final*

In the '815 litigation, Lincoln and Transamerica settled after the claim construction order. The case was then dismissed with prejudice. This raises a question of whether the patentee is

bound by a claim construction order issued in a prior case against a different defendant, even though the prior case was settled after the *Markman* ruling but before the jury verdict. While district courts are divided on this issue, the Federal Circuit has not yet reconciled the differences.

Two lines of cases have been observed among the district courts. One line is represented by *TM Patents v. IBM*, 72 F.2d 370 (S.D.N.Y. 1999). The court in the Southern District of New York, applying the Second Circuit's standards for issue preclusion, held that the prior *Markman* decision is sufficiently final to preclude further litigation, even though it has never reached jury trial. The court reasoned that even though the case was never reviewed by a higher court, "a party who cuts off his right to review by settling a disputed matter cannot complain that the question was never reviewed on appeal." Further, the Supreme Court intended to promote consistencies of the patent claims by empowering judges, rather than juries, to interpret patent claims. *Id*. at 375–376.

Another line of cases reached an opposite conclusion with identical facts. *Kollmorgen Corp. v. Yaskawa Elec. Corp.*, 147 F. Supp. 2d 464 (W.D.Va. 2001); *Graco Children's Products, Inc. v. Regalo Int'l, LLC.*, 77 F. 2d 660 (E.D. Penn 1999). These cases held that the *Markman* order is not essential to a final judgment. *Kollmorgen*, 144 F. Supp. 2d at 467. Although *Kollmorgen* agrees with *TM Patents* on the Supreme Court's intention of promoting uniformity among patent claim interpretations, it differs on how to achieve such uniformity. When parties settle, the Federal Circuit cannot review the claim construction order without the district judge's certification on interlocutory appeals. Also, when the Federal Circuit does review *Markman* orders, nearly 40% of them are either changed or overturned. *Id* (citing *TM Patents*, 72 F. Supp. 2d at 378). Under these circumstances, *TM Patents* thought that consistency should best be achieved by following previous claim constructions, provided that all other factors are satisfied.

*Kollmorgen*, on the other hand, believed that only the Federal Circuit was capable of serving as the final interpreter of patent claim. Given the fact that nearly half of the claim construction cases are reversed on appeal, the *Kollmorgen* court concluded that applying issue preclusion to the prior *Markman* order is inappropriate. *Id*. at 467–468. In addition, that court reasoned that applying issue preclusion would have a chilling effect on settlements because parties would have incentives to fight the case until the end in order to obtain a final judgment. *Id*. at 467.

The Seventh Circuit does not require a final judgment for issue preclusion to apply, as long as prior adjudication on an issue is sufficiently firm to be given a conclusive effect. *In re Bridgestone/Firestone, Inc.*, 333 F.3d 763, 767 (7th Cir. 2003) (internal quotation omitted). Settlement agreements normally do not support an invocation of issue preclusion. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th. Cir. 1990). Although the case between Lincoln and Transamerica regarding the '815 patent was dismissed with prejudice after a settlement agreement, neither Lincoln nor Jackson has shown that, in the settlement agreement, Lincoln and Transamerica stipulated the finality of the '815 *Markman* Order.[3] In addition, the Court is persuaded by the considerations in *Kollmorgen*. Hence, the Court believes that applying issue preclusion to the present case is inappropriate.


*(2)* ***The '201 and '815 Markman Orders are Instructive***

Although both the '201 and the '815 *Markman* orders are nonbinding, this Court nevertheless believes that Judge Bennett's and Judge Springmann's decisions are well-reasoned and instructive. Since uniformity is an important underpinning in the treatment of claim construction as a matter of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995),

---

[3] Several Federal Circuit Cases held that dismissal with prejudice with stipulation on the finality of prior issue determinations constitutes a final judgment. *Reese v. Verizon California, Inc.*, 498 Fed. Appx. 980, 981 (Fed. Cir. 2012); *Flex-Foot, Inc., v. CRP, Inc.*, 238 F.3d 1362, 1370 (Fed. Cir. 2001).

the Court will respect prior interpretations on patent '201 and '815 while engaging in independent analysis.[4]

### D.    Principles of Claim Constructions

Claim Construction is matter of law exclusive for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Court must construe a claim from the perspective of one with ordinary skill in the art. *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed. Cir. 2001). The words of a claim are generally given their ordinary and customary meaning. *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the Court looks to a number of sources to ascertain the meanings. *Id*. at 1314. Those sources include: language of the claims; specifications; prosecution history; and extrinsic evidence such as relevant scientific principles, dictionary meaning, and the state of the art. *Id*. The sources are not equal in hierarchy, however. In determining the ordinary meaning of claim terms, the Court should first consider the intrinsic evidence such as claim language, specification, and prosecution history. *See id*. at 1314–1317. If after examining the intrinsic evidence, the meaning of the claims remains ambiguous, the court may refer to extrinsic evidence.

---

[4] Some cases within and outside of the Seventh Circuit have followed a similar route. *See Kim v. The Earthgrains Co.*, 2005 WL 66071 *11 (N.D. Ill. 2005) ("[W]hile stopping short of according a preclusive effect to Judge Hart's claim construction, the court will bear his interpretations in mind as instructive while rendering its own construction of claims at issue here."); *see also Texas instruments v. Linear Technologies Corp.*, 182 F. Supp. 2d 580, 589 (E.D. Tex. 2002) ("[W]hile the Court is respectful of Judge Heartfield's ruling construing some of the claims in the '674 and '613 Patents, it finds no authority, either binding or persuasive, that instructs that it must utilize the claim construction reached by the court in the Hyundai litigation."); *see also Nilssen v. Motorola*, 80 F. Supp. 2d 924, n.4 (N.D. Ill. 2000) ("[W]hile the Court respects Judge Kennelly's ruling on the same patents in a prior litigation between Nilssen and Magneteck, Inc., the Court is not compelled to reach the same conclusion.")

## *(1)      Hierarchy of Evidence*

The claims themselves are highly instructive in interpreting claim terms. *See id*. at 1314. Generally, claim terms are presumed to be used the same way throughout the patent. *Id*. On the other hand, when different words or phrases are used in separate claims, the claims presumably differ in meaning and scope. *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999). A dependent claim often adds a particular limitation, which raises a presumption that such limitation is not in the independent claim. *Philips*, 415 F.3d 1303 at 1315.

After considering the claim language, the court should also consider the specifications. *See id*. For instance, specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. *Id*. at 1316. Also, prosecution history similarly supplies evidence of how the Patent Office and the inventor understood the patent because it was created by the patentee in attempt to explain and obtain the patent. But the prosecution history is less useful than the specification for claim construction, since it reflects an ongoing negotiation between the applicant and the patent office rather than the outcome of that negotiation. *Id*. at 1317.

Finally, if the intrinsic evidence is not sufficient for determining the acquired meaning of the terms, extrinsic evidence may be useful. *See LB Plastics, Inc. v. Amerimax Home Prods.*, Inc., 499 F.3d 1303, 1308 (Fed. Cir. 2007). However, extrinsic evidence is unlikely to result in a reliable interpretation of patent claim scope, because it is not part of the patent and might cause an interpretation to contradict a patent. *Philips*, 415 F.3d 1303 at 1318. Usually extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimonies, dictionaries, and learned treatises. *Markman*, 52 F.3d at 980. Technical dictionaries can help educate the court regarding the field of invention and the way in which one of skill in the art might use the claim terms. Also, expert testimony is useful in providing

background on the technology at issue, explaining how an invention works, ensuring that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or establishing that a particular term in the patent or the prior art has a particular meaning in the pertinent field. *Philips*, 415 F.3d 1303 at 1318. Nevertheless, the Court should be cautious when relying on experts' testimony, because they may be biased. *See id*.

### *(2)*      ***Rules Regarding The Preamble***

As a general rule, the claim preamble should be construed as a limitation of the claim only if it recites essential structure, or steps, or it is necessary to give life, meaning, and vitality to the claim. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1246 (Fed. Cir. 2008). The Federal Circuit has provided guidelines in making this determination. First, a preamble limits a claim where there is clear reliance on the preamble during prosecution to distinguish prior art. *Catalina Marketing Int'l, Inc. v. Coolsavigns.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Also, when the claim uses text in both preamble and claim body to define an invention, the preamble acts as a limitation of the claim body. On the other hand, if the body of the claim sets out the complete invention, then the preamble may be superfluous. *Eaton Corp. v. Rockwell Int'l. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

### E.      Interpretations of The '201, '608 and '815 Patent Claims

There are three independent claims involved in this case. They are claim 35 of the '201 patent, claim 1 of the '608 patent, and claim 1 of the '815 patent. Because independent claims

are impliedly broader in scope than their dependent claims,[5] the court will begin its discussion on the independent claims.

### (1)    Preamble is a Positive Limitation

The parties dispute whether the preambles in each of the disputed independent claims are limitations of the claim body. Jackson argued that the preambles are not limiting because the claim bodies have already set out the complete steps of administering the invention. Lincoln, on the other hand, presented intrinsic evidence to show that the preambles limit the scope of the inventions. The Court agrees with Lincoln's arguments.

### (a)    Claim 35 of the '201 Patent and Claim 1 of the '608 Patent

The preamble to claim 35 of the '201 patent reads:

> "A computerized method for administering a variable annuity plan having a guaranteed minimum payment feature associated with a systematic withdrawal program, and for periodically determining an amount of a scheduled payment to be made to the owner under the plan."

In the prosecution history, Lincoln argued that its invention relates to a variable annuity plan that guarantees a minimum payment feature which distinguishes prior Golden patent on fixed annuities. ('201 File History at LIN078763). In addition, while the preamble uses the phrase "a variable annuity plan having a guaranteed minimum payment feature associated with a systematic withdrawal program," the steps (c) and (d) of the claim body specifically refer to "the plan." Without references to the preamble, it will be unclear that this patent invents a method specifically related to an annuity plan with guaranteed minimum payments.

Similarly, claim 1 of the '608 patent provides:

---

[5] *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2013).

> "A computerized method of administering an annuity product having a withdrawal feature and a guarantee."

In the prosecution history, Lincoln again distinguishes prior inventions by pointing out the combination of withdrawal and guarantee feature in the '608 patent. (*See* '608 File History at LIN-JA001720–21 ("The present invention relates to an annuity product which is non-tradition. Specifically, the invention relates to a method of administering an annuity product which has a withdrawal feature and a guarantee.") ).

Taken the preambles together with the claim bodies, the two patents provide a method of administering a specific kind of annuity, rather than any kinds of annuity products. Thus, preamble is a positive limitation on the '201 and '608 patent.


*(b)*     *Claim 1 of the '815 Patent*

The preamble of claim 1 states:

> "A data processing method for administering an annuity product having an account value and a guarantee of lifetime payments."

Lincoln, in response to examiner's rejection, argued that the combination of "account value" and "guarantee of lifetime payments" distinguished the Schirripa and Hagan patents. ('815 File History at LIN00184 ("in contrast, the present invention (which is applicable in the case of both immediate and deferred annuities) maintains the concept of an account value after annuitization, and bases certain of its features and benefits on the account value in the post-annuitization period. Neither Hagan nor Schirripa disclose such methodology.")). Furthermore, the claim body includes multiple terms such as "the lifetime payments," "the account value," and "the guarantee," suggesting a reference to the preamble.

The preamble shows the combination of account value and guarantee of lifetime payments in the post-annuitization phase. This combination distinguishes traditional annuities where account value and guaranteed lifetime income cannot coexist after annuitization. ('815 patent, col. 3, lns. 52–55.) The Court finds that the preamble in the clam 1 of the '815 patent is limiting.

*(2)* ***"Comprising Steps Of" Does Not Require Some Steps to Be Performed Before Others***

The parties agree that the transitional term "comprising the steps of" may include additional steps not recited in the claim. They disagree on whether there are some inherent limitations on the order in which the steps are performed.

Presumably, steps of a method are ordinarily not construed to have a particular order, without recitation of an order. *Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1211–12 (Fed. Cir. 2003). In the '815 *Markman* Order, Judge Springmann ruled that there is no inherent requirement that some steps must be performed before others. Specifically, subsequent payment does not have to be determined before initial payment. *Lincoln Nat. Life Ins. Co., v. Transamerica Financial Life Ins. Co.*, 2007 WL 710119 *13 (N.D. Ind. filed March 6, 2007). Jackson, however, merely asserted that some steps must be performed before others without providing any substantial evidence. Hence, the court construe the phrase "comprising the steps of" to mean that the method includes the steps listed in the claim, but is not limited to those steps or the order in which the steps are recited in the claim.

*(3)* ***Payment is Not Withdrawal***

Under a traditional insurance annuity plan, the policy holder either withdraws money from account value without annuitization or receives regular payments from insurance company after annuitization. ('201 patent, col. 3 lns. 60–col. 4 lns 6.)

The three patents at issue, however, have broken this traditional distinction, thus making it difficult for this Court to draw the line. The '201 and '608 patent blurred the difference between withdrawal and payment by blending the concept of guarantee with the systematic withdrawal program before annuitization, while the '815 patent provides account value together with benefit payments after annuitization.

However, as Judge Springmann correctly points out, the word "payment" is not the same as "withdrawal." Withdrawal is a concept that is associated with account value. When the account value is exhausted, it is impossible to further withdraw. *Id*. at 12. The word "payment" is usually associated with "guarantee" or "scheduled" in the disputed claims. This suggests that payment is an obligation from the insurance company. This interpretation also corresponds to claim 35 of the '201 patent. For example, Step (c) states: "making the scheduled payment by withdrawing that amount from the account value." This shows that withdrawal is associated with account value. In step (e), the insurance company is "periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have been made." This provides a guarantee of payment regardless of account value. While the conceptual distinction between payment and withdrawal remains for all three patents in dispute, the Court will analyze the terms associated with them in the context of each patent.

i.      *"Scheduled Payment," "Unscheduled withdrawal," "Adjusting the Amount of the Scheduled Payment," and "Periodically Paying the Scheduled Payment" in the '201 Patent*

The parties disagree on whether these terms incorporate the concept of guarantee. Jackson asserts that these claim terms are merely method steps relating to a kind of systematic withdrawal program. Lincoln insists otherwise, directing the Court's attention to patent specification.

As explained before, there is a distinction between payment and withdrawal. In the context of the '201 patent, the scheduled payment begins when the annuitant elects the benefit option. The insurance company first distributes the payment out of policy holder's account value. In the event that the account value is exhausted before the benefit option ends, the insurance company pays the regular scheduled payments out of its own pocket. (*See* '201 patent, col. 5, lns. 27–30.) ("[P]ayments, first as withdrawals, and later as annuity payments, are adjusted each period to reflect actual net investment returns.")

The court agrees with the Lincoln and the '201 *Markman* order that the term "scheduled payment" refers to a payment that is "guaranteed" under the systematic withdrawal program. Specifically in step (e) of claim 35, the insurer will continue scheduled payments even though the account value is exhausted. In addition, the specification provides that the insurer will guarantee regular payments as long as the annuitant does not withdraw beyond a predetermined percentage. ('201 patent, col. 10, lns. 43–47.)

Unscheduled withdrawal refers to an event that is neither a scheduled withdrawal nor a premium payment or deposit. It decreases the account value and future scheduled withdrawal. ('201 patent, col. 18 lns. 37–47.) Because the scheduled payment is calculated on the basis of a pre-determined percentage, unscheduled withdrawals will eventually deplete account value and

future payments will no longer be guaranteed.[6] Hence, the Court agrees with the Iowa court's

construction that an unscheduled withdrawal is "a withdrawal by the contract holder that is in

excess of the predetermined percentage established by the insurer to keep the guaranteed

payment program in place and that may be made at a different time than a scheduled payment."

*Transamerica*, 550 F. Supp. 2d at 960.


ii.        *"Annuitization" in the '815 Patent*

Both parties agree with Judge Springmann's construction of the '815 patent, but they

disagree on the meaning of annuitization. The '815 *Markman* Order defines annuitization as "the

point when the annuitant starts to receive regularly scheduled payments from the annuity".

*Lincoln Nat'l*, 2007 WL 710119 at *11.

Jackson argues that annuitization means traditional annuitization where the account value is

given up in exchange for a series of payments. This interpretation, however, contradicts the '815

*Markman* Order. Judge Springmann made it clear that the novelty of the '815 patent is to provide

an account value in the post-annuitization phase. *Id*. at 10. This requires account value to exist in

the post-annuitization phase. Traditional annuitization, however, does not provide an account

value after annuitization.

As discussed earlier, payment differs from withdrawal because payment correlates with

"lifetime guarantee." Although the insurance company may pay from the account value,[7] the

"guarantee" is inherent in the scheduled payment, regardless of the account value. Withdrawal,

on the other hand, is an owner initiated transaction in the '815 patent. ('815 patent, col.13, lns.

---

[6] "Under such a program, if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that the withdrawals under this program will last for the period prescribed, including a lifetime." ('201 patent, col. 10, lns. 43–47.)
[7] "[T]o the extent benefit payments are made from the account value, account value is reduced." ('815 patent, col. 12, lns. 58–61.)

20–23 ("Because this invention provides an account value, the insurer may also decide to allow partial withdrawals and additional deposits. If either of these types of owner-initiated transaction occurs, the future guaranteed benefit payments must be adjusted accordingly.")).

In the benefit options described by the '815 patent, annuitants start to receive scheduled payment when their selected options begin. This is similar to traditional annuitization where payment begins upon the election of the annuitization. The difference between the '815 patent and the traditional annuitization is that the '815 patent divorces the concept of account value from annuitization. As a result, the policy holders may withdraw from account value while receiving scheduled payments, even though subsequent scheduled payments may be adjusted according to changes in the account value. Despite this innovation, the '815 patent has not changed the aspects of guaranteed payment in a traditional annuitization. Hence, when account holders elect to annuitize, they choose the guaranteed payment together with the existence of account value.

Because of this parallel, the Court defines annuitization as the point where the insurer begins to distribute scheduled payments to the annuitant under the options that the annuitant has selected, regardless of the existence of account value.

iii.        *"Withdrawal Feature" and "Withdrawal" in the '608 Patent*

Lincoln proposes to limit both terms to only unannuitized accounts while Jackson construes the term to mean distribution from any annuity account. As discussed before, withdrawal is a concept that relates to account value. Unlike the '815 patent where account value exists pre- and post-annuitization, the patent drafter clearly states that the '608 patent only envisions a method that retains account value and withdrawal features pre-annuitization in the patent specification.

('608 patent, col. 10, lns 41–44 ("[T]he variable annuity contract is never "annuitized." Rather, a series of partial withdraws is made from an active (unannuitized) deferred variable annuity contract.")). As a result, the court agrees with Lincoln that the above mentioned terms relate only to unannuitized account.

### (4)    *Step (e) of claim 35 of the '201 Patent is a Contingent Limitation*

Step (e) of Claim 35 reads:

> "Periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have been made."

Jackson argues that the claim requires actually making periodic payments when account value is exhausted. Lincoln's proposed construction, however, states that the step does not require actual exhaustion and that it is sufficient that such payments would be guaranteed if an account value were to become exhausted.

In the previous litigation between Lincoln and Transamerica, the Federal Circuit adopted Iowa court's construction where the step (e) makes a guaranteed payment regardless of the account value. *Transamerica*, 609 F.3d at 1368. The Court agrees with the Federal Circuit and the Iowa court, and hence accept the Iowa court's construction on step (e) as: "at regular intervals required by the plan, paying the scheduled payment to the owner for the period of benefit payments, even if the account value is less than the scheduled payment amount or zero before all payments guaranteed under the plan have been made."

### (5)    *"Wherein" clause in Claim 1 of the '608 Patent is a Contingent Limitation*

The parties disagree on the meaning of the following sentence:

"Wherein if the amount of the withdrawal is less than or equal to the specified withdrawal rate there is a guarantee that, even if the entire account value is exhausted before the end of a specified withdrawal rate will continue to be paid for at least said specified time period."

This sentence is almost identical to step (e) in Claim 35 of the '201 patent. In fact, both parties recycled the same arguments from the '201 patent. Thus, the Court construe this clause the same way as the '201 patent to mean that the "wherein" clause is a contingency limitation that may or may not be satisfied.

*(6)* ***"A Specified Withdrawal Rate for A Given Withdrawal Frequency" in The '608 Patent is Not Indefinite***

Both parties agree on the meaning of the term "given withdrawal frequency" but they differ on whether "a specified withdrawal rate" requires a time factor. The relevant sentence in the prosecution history states "[I]f these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees . . . if total withdrawals do not exceed a predetermined percentage of the account balance over a predetermined period, (termed the "maximum withdrawal rate") in the claims), the insurer guarantees that amounts up to the predetermined percentage will continue." ('608 File History at LIN-JA001721.)

The plain reading of this sentence suggests a separation between predetermined percentage of withdrawal and withdrawal frequency. The percentage of withdrawal is calculated from the account value, while the withdrawal frequency involves time. This separation is also evidenced in the specification. The specification provides an example, in which "a male age 60 may withdraw 4.4% of the initial account value each year under this program and be guaranteed a lifetime income of that amount." ('608 patent, col.11, lns. 1-3.) The "4.4%" is clearly the withdrawal percentage while "each year" is the withdrawal frequency. In addition, the dependent

claims 7 and 8 begin with the phrase "The method of claim 1, wherein a maximum amount of said withdrawal permitted under the guarantee for the given withdrawal frequency." These two claims show that the patent drafter intended to incorporate only a dollar percentage, rather than time into the term "withdrawal rate," while using a separate term for withdrawal frequency. Furthermore, Lincoln also cited dictionary to support that the definition for "rate" does not require a time factor. *Random House Webster's unabridged dictionary* (2nd ed. 2001) define rate as "the amount of a charge or payment with reference to some basis of calculation: a high rate of interest on loans; [or] a fixed charge per unit of quantity: a rate of 10 cents per pound; [or] the premium charge per unit of insurance." The Court agrees with Lincoln's definition and defines "specified withdrawal rate" to mean "a specified dollar amount or predetermined percentage of an account value that may be applied when determining amounts to be distributed that is consistent with preserving the guarantee."

### *(7)     "Unitized Account Value" in the '608 Patent*

The Court agrees with Lincoln that the term "unitized account value" in claim 1 of the 608 patent means an account to which the owner has access to make a partial or complete withdrawal and to which the owner is affected by investment performance in the account. Specifically, in the prosecution history, Lincoln amended the claim to include the term "unitized" to distinguish a previous patent[8] that covers "nonannuitized account."[9]

### *(8)     Other Terms*

---

[8] *See* '608 File History, LIN-JA001715.
[9] *See* '608 File History, LIN-JA001724.

Court is not required to construe every term when there is no genuine dispute as to its meaning. *See O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 523 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict Courts are not (and should not be) required to construe every limitation present in a patent's asserted claims"). The terms such as "annuity," "variable annuity," "systematic withdrawal program," "guaranteed minimum payment feature associated with a systematic withdrawal program," "withdrawal rate," "payout term," "benefit payments," "period of benefit payments," "determining an initial scheduled payment," and "periodically determining account value" in claim 35 of the '201 patent as well as dependent claims 36, 37, and 38 of the same patent have already been construed by Judge Bennett in the Iowa litigation. The Court sees no reasons to adopt a different interpretation from the ones in the '201 *Markman* Order.

Although Lincoln also asked the Court to construe terms "periodically determining an amount [of a scheduled payment]," "storing data relating to a variable annuity account," "account value," "making the scheduled payment by withdrawing that amount from the account value," "monitoring," "adjusting the amount of the scheduled payment in response to said unscheduled withdrawal," "master record," "generating a report," and "forwarding a report" in the '201 patent, the meaning of these terms are obvious and do not require further construction in light of the '201 *Markman* Order and this Court's construction.

Similarly, the terms in the in the '815 patent such as "annuity product," "guarantee of lifetime payments," "establishing a charge for paying the lifetime payments after the account value reaches zero in accordance with guarantee," "determining an initial benefit payment," and "determining a subsequent periodic benefit payment" have already been construed by Judge Springmann in this district. The Court agrees with the Judge Springmann's construction on those

terms. Other terms in '815 patent such as "paying lifetime payments," "guarantee," "using a computer," "periodically determining the account value," "periodically paying the initial payment and subsequent payment and reporting the account value to the beneficiary," "asset charge," "at least one of a death benefit and cash surrender benefit," and the account value formula in dependent claim 32 do not present a core issue in this dispute. Hence, the Court will not construe them separately.

For the '608 patent, the terms "computerized method," "annuity product," "guarantee," "owner," "account owner," "account value," "specified time period," "cumulative withdrawals," and "highest account value achieved as of a specified date" in claim 1, as well as dependent claims 2, 3, 5, 7, 8, 9, 10, 14, 15, 17, 18, and 19 do not present a separate issue in the center of this litigation. As a result, the Court will not dive into the interpretations of these terms.


**F.      Conclusion**

The claims, terms, and phrases of the patent at issue are thereby construed and set forth in this Order.


SO ORDERD on October 30, 2013.


   s/ Joseph S. Van Bokkelen     
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE